Ray Brian RENUSCH, Petitioner–
Appellant,

v.

Mary BERGHUIS, Warden
Respondent–Appellee.

No. 01–2373.

United States Court of Appeals,
Sixth Circuit.

Sept. 12, 2003.

**416**

Joan E. Morgan, Sylvan Lake, MI, for Petitioner–Appellant.

Raina I. Korbakis, Laura Graves Moody, Office of the Attorney General, Lansing, MI, for Respondent–Appellee.

Before NORRIS, BATCHELDER, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.

In 1995 a Michigan state jury found petitioner Ray Renusch ("Renusch") guilty of first degree criminal sexual conduct, in violation of Michigan Compiled Laws ("M.C.L.") § 750.520b. After the Michigan Court of Appeals rejected his appeal, he filed this federal habeas action. The district court rejected his claims but granted him a limited certificate of appealability. He contends that the Michigan Court of Appeals misapplied Supreme Court precedent when it rejected his arguments that his counsel was ineffective for failing to hire a certain expert on his behalf and when it upheld the trial court's refusal to allow an *in camera* review of the counseling records of the victim of Renusch's criminal sexual conduct. Finding no merit to his claims, we affirm the district court.

### Facts

On June 3, 1993. Renusch was indicted in Macomb County. Michigan. for first-degree criminal sexual conduct. *See* M.C.L. § 750.520b(1) ("A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists: (a) That other person is under 13 years of age."). Trial commenced approximately two years later, on July 25, 1995.

The trial concerned Renusch's alleged molestation of Laura Hall, who was six years old in 1992, the time of the incident in question. Laura's parents, David and Angela Hall, were then recently divorced; David had custody of Laura, and Angela had visitation rights. Angela, during times when Laura was visiting, would frequently drop Laura and Laura's brother Jeff off to stay overnight with their Aunt Patricia, who was Angela's sister.

One Saturday morning in March of 1992 Laura and Jeff were at Patricia and Renusch's house, having stayed the night there. Patricia had left early that morning for work, Jeff was downstairs watching TV, and Laura and Renusch were alone upstairs. Renusch told Laura that she needed to take a bath, and he, fully clothed, helped wash her off. According to Laura, "he scrubbed my vagina longer than the other parts," making her feel uncomfortable. She asked him to stop, and he did, but when she was drying herself off he told her to come into his bedroom, where she found him lying under a blanket, naked. He removed her towel, pulled her under the blanket and on top of him, and, as she described it, he began "rubbing [her] up and down" with his erect penis "pushing" against her private parts so that it hurt. J.A. at 151–53. After a while she asked him to stop, and he did.

Later that morning Renusch dropped Laura and Jeff off with Angela. Laura was angry and upset, and she told Angela about the bath incident but not about what

Renusch had done to her in his bed. Angela was concerned. and at Laura's request she never had Laura spend the night there again, but it was not until November of that year that Laura disclosed what Renusch had done to her in the bed, in a conversation with her stepmother Corinna (David's wife). Corinna told Angela about the incident, and Angela told the police. Renusch called Angela in September of 1993, wanting to explain his side of the story. According to Angela, he told her that on the morning in question Laura had got up early and had voluntarily come into his room, where he was sleeping naked under his blanket; she had "climbed on top of him and started wiggling." J.A. at 165.

Renusch related the events quite differently. He testified that he gave Laura a bath that morning in 1992, but he did not scrub her vagina in any manner, and only washed her hair. Afterwards he wrapped her in a towel, dried off her hair, let her get dressed while he brought Jeff upstairs to take a shower, and then they breakfasted. Renusch denied that there was any incident of her being in bed with him, and he maintained that in his September 1993 talk with Angela, he said nothing about a bed incident and told her only what he said at trial: he gave Laura a shower that morning, and that was all. Renusch said he did not know why Laura made up the story.

Laura was not the only witness to testify of Renusch's molestation, however. The trial court allowed the prosecution to present the testimony of two sisters, Jessica and Mandy Micheau, who alleged that Renusch had molested them, too. Their testimony was offered to show that Renusch's conduct had not been a mere mistake or inadvertency. It seems that Renusch had lived with Jessica and Mandy and their mother for several years in the 1980s, beginning when Jessica was eight and Mandy was a few years younger. Jessica testified that "one night he took his penis and ... inserted it not all the way but just to the outer layer of my vagina, was pushing it in and out" and added that he had done this on more than one occasion. J.A. at 178. When the police, during their investigation of Renusch regarding Laura, asked Jessica if Renusch had ever molested her, Jessica at first denied it, but she then decided to testify—in order to keep him from doing it to anyone else—when they told her that they wanted to know because he had allegedly abused another girl (Laura). Mandy testified that, on a regular basis, Renusch played "sex games" with her–that is, "he would sit between my legs and rub his penis up and down against my vagina." J.A. at 182. She later told various people about the incidents, and related the incidents to the officers investigating Renusch, though she had wanted to avoid testifying in court until she heard that the case involved his abuse of another young girl.

The jury found Renusch guilty, and he was sentenced to 8 to 20 years imprisonment. Renusch obtained a new lawyer, and then filed a motion for a new trial in which he argued that his trial counsel, Lawrence Peppler, had been constitutionally ineffective because he had failed to procure an expert who could explain why the girls might have wanted to lie in order to send him to jail. The trial court ordered an evidentiary hearing. *See People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922, 925 (1973) ("A defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing for the purpose of establishing his claims with evidence as a precondition to invoking the processes of the appellate courts[.]"). After the hearing, however, the trial court denied the motion.

Renusch appealed to the Michigan Court of Appeals, raising eight claims—among them, the two now on appeal—but the court affirmed. He also appealed to the Michigan Supreme Court, but that court denied his application for leave to appeal.

Renusch then filed a petition for habeas corpus in the Eastern District of Michigan. Thereafter a federal magistrate issued a Report and Recommendation in which he advised that the district court should deny Renusch's petition. Renusch filed objections, but the district court issued an opinion that rejected the objections and denied his petition, though it granted a certificate of appealability for the two claims that he now raises.

### Analysis

We review *de novo* the district court's denial of the writ. *Harris v. Stovall*, 212 F.3d 940. 942 (6th Cir.2000). Because Renusch's habeas petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.*, became effective on April 24, 1996, the provisions of that Act apply to his case. *See Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir.1999). We review Renusch's appeal from the state court's judgment under the standard established at 28 U.S.C. § 2254(d)(1), which allows federal courts to grant a writ for fully adjudicated state claims only where the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" *See also Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (interpreting this provision); *Bailey v. Mitchell*, 271 F.3d 652, 655–56

(6th Cir.2001) (summarizing the Supreme Court's instructions regarding how to interpret and apply § 2254(d)(1)). Our focus in this inquiry is consequently not on the broad question of whether the trial court erred—as if we were considering this case on direct review—but rather on the limited question of whether in upholding Renusch's conviction, the Michigan Court of Appeals violated clearly established federal law as determined by the United States Supreme Court. We conclude that it did not.

### I. Ineffective Assistance of Counsel

■ Renusch argues that Peppler's failure to obtain an expert witness was so egregious as to violate the effectiveness standard established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To consider the merits of his claim, we must look at the facts that came out when the trial court held its evidentiary hearing regarding Renusch's motion for a new trial.

### A. Background

The first witness at the new trial hearing was Peppler. It seems that Renusch retained him in February of 1994, and early-on they discussed the possibility of bringing in an expert. Dr. Melvin Guyer, to challenge Laura's credibility.[1] On February 6, 1995, a little over four months prior to trial. Peppler wrote a letter to Renusch stating that "I am in complete agreement with regards to the use of Dr. Guyer." It was also during February, however, that Peppler filed a motion to exclude the testimony of the Micheau sisters—a motion that was denied on June 21, 1995, about a month prior to the trial.

---

1. Renusch's wife Patricia also testified that she had learned of Guyer's expertise long before trial, and that on numerous occasions she and Renusch had asked Peppler to contact Guyer. Patricia contacted Guyer herself prior to the trial, but Guyer had told her that Renusch's attorney should contact him.

Peppler explained that the denial of this motion caused him to reconsider whether he should bring in Guyer. In Peppler's view, it was one thing to have an expert challenge the testimony of a single witness, and quite another to have the expert challenge three witnesses, two of whom had never met or heard the story of the victim of the present offense, and would testify about entirely independent incidents. He added that an additional reason was that Renusch had confessed to him that on the morning in question, "Laura Hall had come into his bedroom and that he was lying on the bed nude, that she had willingly climbed onto his bed, whereupon he indicated that he lifted her onto his chest and after a period of time set her back on the floor and she left." J.A. at 261–62. On this basis, Peppler concluded that Renusch was likely guilty of second degree criminal sexual contact.[2] The only detail Peppler was not sure about was whether Renusch had touched Laura's intimate parts for the purpose of sexual gratification—though Peppler had reason to suspect that it was for this purpose because Renusch had on another occasion admitted to Peppler that he had had sexual feelings toward Laura. Peppler testified that he had felt that he would be endangering the truth-seeking function of the trial, as well as his own ethical responsibilities, if he had presented a witness

who would suggest that Laura's testimony was a fabrication, when he knew that her testimony was substantially true.

Peppler nevertheless did inquire with Guyer. Though Peppler did not contact Guyer himself. he had his co-counsel Daniel Besser call Guyer a week or two before trial. Besser related the conversation to Peppler, and Peppler testified that his impression of the conversation was that Guyer had said that "he didn't feel he would be able to help much under the circumstances." J.A. at 218. Peppler said he assumed that Besser—who was familiar with the case—would know that they were interested in Guyer's ability to attack credibility.[3]

Guyer himself also testified at the hearing. He is a professor of child and adolescent psychiatry at the University of Michigan and has also earned a law degree at that University. An authority in the field of the "suggestibility" of child witnesses, Guyer has testified with good effect in a number of cases, including several involving multiple child witnesses. Defendants had been acquitted in 20 of the 25 cases he had testified in, though none of his victories involved a situation where—as here—there were child witnesses attesting to unrelated incidents, and the independent witnesses had not heard the story of the victim of the charged crime. Guyer explained that expert testimony can often

---

2. The difference between first and second degree criminal sexual conduct is that first degree requires "sexual penetration" and second degree requires only "sexual contact." *See* M.C.L. § 750.520c(1) ("A person is guilty of criminal sexual conduct in the second degree if the person engages in sexual contact with another person and if any of the following circumstances exists: (a) That other person is under 13 years of age."); M.C.L. § 750.520a(1)(1995) ("'Sexual contact' includes the intentional touching of the victim's ... intimate parts ... if that intentional touching can reasonably be construed as be-

ing for the purpose of sexual arousal or gratification[.]").

3. Besser, however, seems to have been under the mis-impression that they wanted Guyer to testify about physical, not psychological evidence. He testified that Guyer had been surprisingly short with him and explained that if they needed someone to testify about *physical evidence*, they should look for a different expert. Besser did not recall if he discussed any psychological matters with Guyer, but he did recall telling Peppler that Guyer would not testify about physical matters.

affect the outcome of sexual misconduct cases that turn on the reliability of child witnesses, because juries otherwise tend to ignore evidence suggesting that the testimony is unreliable. Though Guyer is selective about the cases he will testify in, he said that he would have testified in Renusch's case because he saw a number of suspect factors that could have caused Laura or the Micheau sisters to fabricate or embellish their testimony. Laura, for example, was the subject of custody battles that could have given her or those who elicited her story a motive to get Renusch into trouble; Laura had seen pornographic movies on one or more occasions; Laura's mother was openly involved in a sexual relationship with another woman; and the police had failed to follow the standard precautionary procedures when they elicited Laura's story. Regarding the Micheau sisters, the story Mandy first told the police had involved startlingly exotic details that suggested fabrication; Jessica had at first denied any molestation; and the police had interviewed the sisters in ways that were likely to cause their testimony to be unreliable.

### B. The Merits of the Ineffectiveness Claim

Ineffective assistance of counsel claims are generally governed by *Strickland v. Washington,* in which the Supreme Court established a two-part inquiry:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687.

In determining whether an attorney's conduct was deficient, the *Strickland* Court stressed that "the proper standard for attorney performance is that of reasonably effective assistance," "viewed as of the time of counsel's conduct," and considered "in light of all the circumstances." *Id.* at 689, 690. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

The Michigan Court of Appeals found that Peppler's decision was a justifiable trial strategy, given that Renusch was faced with independent witnesses testifying to independent incidents, Guyer had not previously testified successfully in a case like this, Guyer's effectiveness would have been limited because Michigan's law of evidence prohibited him from testifying directly as to the witnesses' veracity, and Peppler had instead pursued the valid alternate strategy of presenting character witnesses and other witnesses in Renusch's favor. *See People v. Renusch,* 1999 Mich.App. LEXIS 2048, at *8–*9, 1999 WL 33454009, *3 (Mich.Ct.App. Feb. 19, 1999). The district court, reviewing this decision, found that the Michigan Court of Appeals had not contravened the AEDPA standard. The district court sup-

ported its finding by noting that Peppler's ethical concerns were an additional justification for his decision.

The Michigan Court of Appeals' decision here was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The operative precedent here was *Strickland*, which set out no specific instructions regarding the hiring of experts. Instead, such decisions fall under *Strickland*'s general reasonableness requirements, and also perhaps under its duty-to-investigate rubric: "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland,* 466 U.S. at 691.

Peppler's decision not to pursue Guyer was questionable, and in hindsight was perhaps an error, but nevertheless it was within "the wide latitude" Peppler had in making strategic trial choices. *Id.* at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

Our primary reason for so finding is that Peppler did contact Guyer, through his assistant Besser. The testimony was conflicting and unclear regarding whether Besser understood that Guyer was to testify about psychological and not physical matters, and what Besser communicated to Peppler, but Peppler made it clear that he had not been aware of any mistake,[4] and his impression was that Guyer thought his testimony would be of little use under the circumstances. The Michigan Court of Appeals did not question Peppler's judgment or veracity here, and we cannot say that this was an unreasonable determination.

Additionally, Peppler had reason to question whether Guyer would be useful in attacking the credibility of multiple independent witnesses. Though Guyer testified that he thought he would nevertheless have been of use, this was a hindsight judgment. Renusch also contests this rationale by pointing out that Peppler himself took on the task—which he deemed too difficult an undertaking for Guyer—of challenging the credibility of the three witnesses. But Peppler had a duty to question their credibility, and by deciding that Guyer's testimony would be of little use given the circumstances, he was not simultaneously deciding that his own credibility challenges on cross-examination would be useless.[5]

---

4. For example, at the evidentiary hearing Renusch's counsel asked Peppler, "[I]s it true as far as you know Mr. Besser may have talked [with Guyer] only about the medical aspect of this case, the lack of medical evidence?" Peppler's response: "if it is true it would be a surprise to me." R.22 at 23–24.

5. There was also Peppler's ethical concern that he would be defeating the trial's truth-seeking function and violating his ethical responsibilities by presenting Guyer to challenge Laura's substantially-true testimony as a fabrication. There is reason to question the reasonableness of his concern here, at least based on written ethical canons. (The Michi-

gan Court of Appeals considered this problem, but declined to make a determination.) According to Michigan Rule of Professional Conduct 3.3(a), "[a] lawyer shall not knowingly ... offer evidence that the lawyer knows to be false." The rule appears to be aimed at directly false testimony, and not at valid testimony that challenges testimony the lawyer knows to be substantially true. Consequently, it is unlikely that Peppler would have been violating this rule by presenting Guyer. Further, even if Renusch had admitted to being guilty of second-degree criminal sexual conduct, he did not admit to "penetration"—the element that distinguishes first degree from second degree criminal sexual conduct—and

On balance, we conclude that the Michigan Court of Appeals' decision that Peppler's conduct was objectively reasonable was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Renusch has failed to show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. It is consequently unnecessary for us to consider the prejudice prong of *Strickland.*

### C. Conflict of Interest

■ Renusch additionally argues that Peppler's ethical concerns created a conflict of interest that should lead us to presume that Renusch was prejudiced thereby. The legal basis for this claim is set out in *Strickland,* where the Court noted that according to the rule of *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), prejudice is presumed where the defendant demonstrates that counsel " 'actively represented conflicting interests' " and that " 'an actual conflict of interest adversely affected his lawyer's performance.' " *Strickland,* 466 U.S. at 692 (quoting *Cuyler,* 446 U.S. at 350, 348 (footnote omitted)).

Renusch's claim on this basis fails even prior to the merits, however. As the Warden correctly points out, the Supreme Court has applied *Cuyler*'s special standard only in cases where the attorney was conflicted because he or she was representing (or had consecutively represented) more than one party. This means that there is no Supreme Court case on all fours—legally or factually—with the present one. *See Williams,* 529 U.S. at 405 ("[A] state-court decision is contrary to

this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law.... [A] state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours."). Further, though a state court's decision can constitute an "unreasonable application of" clearly established Supreme Court precedent under AEDPA where the state court "unreasonably refuses to extend that principle to a new context where it should apply," *Williams,* 529 U.S. at 407, it is now manifest that a refusal to extend *Cuyler* beyond multiple representation cases is not unreasonable. *See Smith v. Hofbauer,* 312 F.3d 809, 817 (6th Cir.2002) ("Because the question of whether ... [*Cuyler v. Sullivan's*] lessened standard of proof for a claim of ineffective assistance of counsel based upon an attorney's conflict of interest for anything other than joint representation remains an 'open question' in the jurisprudence of the Supreme Court, [quoting *Mickens v. Taylor,* 535 U.S. 162, 176, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002)], and in fact was an open question at the time Petitioner's case was heard [1995], Petitioner's claim fails because it is not based upon clearly established Supreme Court precedent as mandated by AEDPA."). We conclude that since this is not a joint representation case, the Michigan Court of Appeals was not unreasonable in failing to grant relief to Renusch under *Cuyler.*

### II. Inspection of Laura's Counseling Records

■ We also find no merit in defendant's claim regarding access to the vic-

---

he did not admit that the Micheau sisters' testimony was true. Consequently, in no sense would Guyer's testimony have been

"false" in relation to these aspects of the testimony against Renusch.

tim's counseling records. In a pretrial hearing held several months before Renusch's trial, Peppler asked the trial court to permit him to review *in camera* Laura's counseling and psychological records. Laura had apparently been through extensive counseling, and Peppler's motion listed various factual reasons why he thought her records were likely to be of use. Peppler's primary legal ground was *People v. Stanaway,* 446 Mich. 643, 521 N.W.2d 557 (1994), which held that "where a defendant can establish a *reasonable probability* that the privileged records are likely to contain material information necessary to his defense, an in camera review of those records must be conducted to ascertain whether they contain evidence that is reasonably necessary, and therefore essential, to the defense." *Id.* at 562 (emphasis added); *see also* Mich. Court Rule 6.201(C)(2) ("If a defendant demonstrates a good-faith belief, grounded in articulable fact, that there is a reasonable probability that records protected by privilege are likely to contain material information necessary to the defense, the trial court shall conduct an in-camera inspection of the records."). The trial court refused.

The Michigan Court of Appeals found that

in our judgment, the trial court did not abuse its discretion overall because defendant failed to make the required showing that there was a "reasonable probability" that the records contained necessary information. Defendant argued that the victim was the product of a dysfunctional family, the target of a bitter custody dispute, that she had been exposed to her mother's romantic relationship with another woman and that she had experimented sexually with her brother; and that these "recent experiences could have easily generated false accusations." However, defendant did not set forth any good faith basis for

believing that false accusations were ever actually made, nor how these events of the victim's life would have resulted in false accusations. A more specific justification than simply reciting difficult or troublesome aspects of a victim's life is necessary to mandate an in camera inspection of privileged records. Thus, in this case, we do not believe that the court abused its discretion in denying defendant an in camera inspection of the victim's psychological records.

*Renusch,* 1999 Mich.App. LEXIS 2048, at *16–*17.

This analysis was neither in conflict with, nor an unreasonable application of, any United States Supreme Court precedent. The seminal Supreme Court case in this area is *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), in which the defendant, Ritchie, had allegedly molested his daughter. The daughter had told her story to the police, who directed her to Pennsylvania's Children and Youth Services ("CYS") agency, which in turn investigated the matter. Ritchie sought to discover the CYS's materials, arguing that they might lead him to favorable witnesses and unspecified exculpatory evidence, and they might contain a certain medical report he was looking for. The agency refused, citing a state statute that forbade it to disclose its materials except where (among other things) a court ordered it to do so. The trial court refused to allow discovery, and Ritchie appealed. The United States Supreme Court held that since there was no way to tell whether the CYS's information was material, and since the state's privilege was not absolute because the statute did provide Ritchie with some means (*i.e.,* a court order) to obtain the information, "we therefore have no reason to believe that relevant information would not be disclosed when a court of competent jurisdic-

tion determines that the information is 'material' to the defense of the accused." *Id.* at 58. In a footnote, the Court pointed out that "[w]e express no opinion on whether the result in this case would have been different if the statute had protected the CYS files from disclosure to *anyone,* including law-enforcement and judicial personnel." *Id.* at 57 n. 14 (emphasis in original).

This established that Ritchie was entitled to a review, but it did not answer the question of what a defendant's threshold burden is for obtaining an *in camera* review. The *Ritchie* Court addressed this somewhat, in a footnote:

> The Commonwealth also argues that Ritchie is not entitled to disclosure because he did not make a particularized showing of what information he was seeking or how it would be material.... Ritchie, of course, may not require the trial court to search through the CYS file without first establishing a basis for his claim that it contains material evidence. *See United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) ("He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense"). Although the obligation to disclose exculpatory material does not depend on the presence of a specific request, we note that the degree of specificity of Ritchie's request

may have a bearing on the trial court's assessment on remand of the materiality of the nondisclosure. *See United States v. Bagley,* 473 U.S. 667, 682–683, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (opinion of BLACKMUN, J.).

*Id.* at 58 n. 15. The clearly established "rule" of *Ritchie,* then, is that, given a privilege statute like Pennsylvania's, a defendant is "entitled to have a [government social services] file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial," but only if the defendant has "establish[ed] a basis for his claim that it contains material evidence," *e.g.,* by making "some plausible showing of how [the] testimony would have been both material and favorable to [the] defense."[6] *Id.* at 58 & n. 15.

The arguably more demanding "reasonable probability" standard applied by the Michigan Court of Appeals was established by the Michigan Supreme Court in *Stanaway,* a case that distinguished *Ritchie.* The *Stanaway* court was considering three Michigan statutory privileges, one of which was the sexual assault counselor-victim privilege, M.C.L. § 600.2157a(2), and the court held that for all of the privileges, the legislature intended "to preclude defendants from having any access to communications made in these counseling settings." 521 N.W.2d at 564, 567. The court found that *Ritchie's* disclosure requirement did not apply to these Michigan privilege stat-

---

**6.** It is not clear that the Supreme Court in *Ritchie* required state courts to use the "plausible showing" standard to determine whether a defendant has established "a basis for his claim." That is, though *Ritchie* stated that a defendant cannot obtain an *in camera* review without "first establishing a basis for his claim that it contains material evidence," the Court did not directly state what that standard should be, and the words "plausible showing" appear only in the Court's parenthetical quote from another case. *See* 480

U.S. at 58 n. 15. A number of courts have missed the hint, either by drawing a different standard from *Ritchie,* or by assuming that *Ritchie* left the issue unresolved. *See, e.g., Davis v. Litscher,* 290 F.3d 943, 946 (7th Cir. 2002) (holding that under *Ritchie* the standard is reasonable probability); *Commonwealth v. Bishop,* 416 Mass. 169, 617 N.E.2d 990, 996 (1993) (requiring defendants to make a threshold showing that records are "likely to contain relevant evidence" before an in camera review is granted).

utes because (1) "[p]art of the [*Ritchie*] Court's rationale for upholding in camera inspection was the fact that the records were those of a government agency," *id.* at 569, and (2) *Ritchie* relied on the fact that Pennsylvania's statutory privilege was qualified, and allowed for the information to be used in judicial proceedings, but Michigan's privileges were absolute and did not allow for judicial use, *id.* at 569–70. The *Stanaway* court then established its "reasonable probability" requirement, without citing or expressly considering the reference in *Ritchie*'s to a "plausible showing" standard. *See id.* at 574.

The *Stanaway* court adequately distinguished *Ritchie*, and hence in Renusch's case the Michigan Court of Appeals did not act contrary to clearly established Supreme Court precedent by applying *Stanaway*'s "reasonable probability" standard, as opposed to the "plausible showing" standard referred to in *Ritchie*. We need not decide whether the Michigan courts have properly distinguished *Ritchie*. It is sufficient to conclude, as we do, that the *Stanaway* court's distinguishing of *Ritchie* was at least reasonable. The decision of the Michigan Court of Appeals applying the *Stanaway* standard is thus not contrary to, nor an unreasonable application of, Supreme Court precedent. Further, assuming for the moment that the underlying concerns of *Ritchie* require as a constitutional matter that the Michigan courts apply the *Stanaway* standard in a reasonable way, we conclude that they did so in this case.

## Conclusion

For these reasons, we AFFIRM the judgment of the district court.